**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **SHEDENNA DOCKERY,**<br><br>**Plaintiff,**<br><br>**v.** | ) | **No.:** |
| **MARGIE QUIN, in her individual and official capacities as Commissioner of Tennessee Department Of Children's Services**<br><br>**Defendant.** | ) | **JURY DEMANDED** |

---

**COMPLAINT**

---

Comes now Shedenna Dockery, by and through counsel, and sues Defendant Margie Quin, in her individual capacity as Commissioner of Tennessee Department of Children's Services ("Defendant") as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Ms. Dockery is an adult citizen and resident of Jefferson County, Tennessee.

2. Defendant Margie Quin is, and at all times relevant to this Complaint was, the Commissioner of the Tennessee Department of Children's Services (the "Department" or "DCS").

3. As Commissioner of the Department, Quin administers and enforces policies and regulations relating to the Department's employees. Tenn. Code Ann. §37-5-104.

4. Quin personally fired Ms. Dockery and signed her termination letter. Thus, Quin is responsible for violating Ms. Dockery's First Amendment rights.

5. At all times relevant to this Complaint, Quin acted under color of state law and is

sued in her individual and official capacities.

6. This case arises under the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1983 and 1988, for Defendant's deprivation of Ms. Dockery's rights under the First Amendment.

7. The Court has subject matter jurisdiction pursuant to, inter alia, 28 U.S.C. § 1331 (federal question).

8. Venue is proper pursuant to, inter alia, 28 U.S.C. § 1391.

## FACTUAL BASIS

**Plaintiff Shedenna Dockery and her employment with the Department.**

9. Ms. Dockery was employed by Defendant from February 3, 2003 to November 18, 2025.

10. Ms. Dockery has dedicated most of her working life to public service, including over twenty-two years with DCS.

11. Ms. Dockery's public service includes, *inter alia*, a candidacy for Newport City Council and service as the president of Tanner Committee Inc., co-founder and president of the Afro American Historical and Genealogical Society's East Tennessee Chapter, treasurer and president of the Cocke County Democratic Women's Club, membership on the board of directors for the Community Economic Development Network of East Tennessee (CEDNET) (including chairing the group's African-American Task Force), service on the advisory board of East Tennessee Black Pages, acting as co-founder and chief organizer of the Cocke County Diversity Festival, and acting as local coordinator of Martin Luther King III's Realizing the Dream project.

12. Ms. Dockery has been in a supervisory position with DCS since 2011.

13. Most recently, Ms. Dockery was employed as a Case Manager IV.

14. In her position as Case Manager IV, Ms. Dockery supervised between three (3) and five (5) employees at any given time.

15. During her tenure with DCS, Ms. Dockery regularly received excellent performance reviews and was never the subject of any disciplinary action, performance improvement plan, or coaching.

16. Moreover, no co-worker or client had ever made any complaints about Ms. Dockery's treatment of any other person.

**Ms. Dockery's personal Facebook use.**

17. Ms. Dockery, like millions of Americans, regularly uses social media to communicate with family and friends. Oftentimes, Ms. Dockery addresses current issues of public concern and expresses her personal opinions about same.

18. Throughout her years working at the Department, Ms. Dockery has regularly posted on social media about public issues, most often through Facebook. In communications through her Facebook account, Ms. Dockery does not identify herself as a state employee and has never referenced her employment with the Department on her personal Facebook.

19. At no time during her tenure with the Department did Ms. Dockery's personal speech on social media affect her ability to perform her job.

20. No Department employee who worked with Ms. Dockery ever objected to her personal social media use.

21. No member of the public who the Department served or with whom Ms. Dockery interacted via her job ever made any comment or complaint about her personal comments on social media.

**"Whites Only" Return to the Land group.**

22. In September 2023, a group that operates under the name Return to the Land ("RTTL") was formed. The group purchased approximately 160 acres in Arkansas to build a white separatist community.[1]

23. The group began gaining national attention on news and social media outlets in summer 2025.[2]

**Ms. Dockery shares satirical reels on Facebook about RTTL**

24. Around the time that RTTL began gaining notoriety nationwide (summer 2025), Ms. Dockery shared two reels (short video clips) on Facebook which discussed RTTL.

25. The first reel was created by content creator, Corey Magyar, not Ms. Dockery. The reel is obvious satire and claims that if RTTL wants to create on "whites-only" community it should go "all-in" by giving up the use of inventions created by people of color, including cell phones, GPS, motor vehicles, shoes with rubber soles, air conditioning, mosquito repellant, and computers.[3]

26. The second reel is a similar post by the page "theblackdetournews," not Ms. Dockery, which includes a video clip from the "I've Had It Podcast." The podcast is hosted by two white women, Jennifer Welch and Angie Sullivan. Ms. Dockery is not associated with the podcast.

27. In the reel, one of the women discusses her feelings towards those who seek a

---

[1] *See e.g.,* Cassie Miller, Jeff Tischauser, *Inside Return to the Land, a New Group Attempting to Legalize Segregation*, Southern Poverty Law Center, September 24, 2025, https://www.splcenter.org/resources/hatewatch/inside-return-land-new-group-legalize-segregation/.

[2] *See Id*; *see also, 'Whites-only' Group Draws Bipartisan Rebuke Over Potential Move to Missouri*, Jason Hancock, Missouri Independent, July 31, 2025, https://missouriindependent.com/2025/07/31/whites-only-missouri-lawmakers/; Debra Kamin, *The Founders of This New Development Say You Must Be White to Live There*, New York Times, Aug. 19, 2025, https://www.nytimes.com/2025/08/19/realestate/arkansas-white-housing-return-to-land.html.

[3] The reel can be found at https://www.facebook.com/reel/1315883696990764.

white-dominant culture. The woman in the reel states, *inter alia*, that such people should not "participate in any of the shit that makes America cool," and that "what makes America cool is multiculturalism."[4]

28. The reel is also satirical, as evidenced by several of the statements made within the reel, including that, "to see these fat ass, pink arm, teeny weeny, beta pricks, with their ugly ass wives walk into this Mexican restaurant and sit down and smile and be friendly, I don't think you should be able to enjoy anything but Cracker Barrell."

29. Ms. Dockery shared these reels to her own personal Facebook account on her own time, outside of work hours.

30. No Department employee who worked with Ms. Dockery ever objected to her sharing of these reels.

31. No member of the public who the Department served or with whom Ms. Dockery interacted via her job ever made any comment or complaint about her sharing of these reels.

**Charlie Kirk.**

32. Charlie Kirk was a well-known conservative activist who founded the political organization "Turning Point USA."

33. Kirk was a public figure of political importance who discussed and debated matters of public and political interest on various publicly broadcasted platforms.

34. On September 10, 2025, Kirk was assassinated while speaking at Utah Valley University.

35. Kirk's death immediately became a topic of great public concern and political

[4] The reel can be found at https://www.facebook.com/reel/1299298921719191.

relevance.[5]

36. Indeed, on October 14, 2025, President Trump issued a proclamation making October 14, 2025, a National Day of Remembrance for Charlie Kirk.[6]

37. Kirk's murder triggered expressions of outrage and condemnation, as well as expressions of negative views regarding what Kirk stood for politically. Discourse regarding Kirk and his public political views have been a topic of public and political interest and has been widely and publicly discussed by politicians, journalists, influencers, and members of the public.

**Ms. Dockery's Facebook Comment about Kirk.**

38. On September 11 or 12, 2025, Bradley Rogers, Ms. Dockery's son, made a post on his personal Facebook account regarding the assassination of Kirk. The post was a meme which showed a quote of Kirk's in which he expressed his belief that some gun deaths are a necessary trade off to protect the Second Amendment.[7]

39. In response to another person's comment under Mr. Roger's post, Ms. Dockery commented, "the chickens are coming home to roost," or something similar.

40. Ms. Dockery's comment was made from her personal Facebook account on her own time, outside of work hours.

41. Ms. Dockery's comment did not appear on her Facebook account, but only as a

---

[5] *See, e.g., What to Know About the Aftermath of Charlie Kirk's Assassination*, Associated Press, Sep. 15, 2025, https://www.pbs.org/newshour/nation/what-to-know-about-the-aftermath-of-charlie-kirks-assassination.

[6] *See, National Day of Remembrance for Charlie Kirk*, Proclamation of President Donald J. Trump, Oct. 14, 2025, https://www.whitehouse.gov/presidential-actions/2025/10/national-day-of-remembrance-for-charlie-kirk/.

[7] The full quote is as follows: "I think it's worth to have a cost of, unfortunately, some gun deaths every single year so that we can have the Second Amendment to protect our other God-given rights." Ashley Ahn and Maxine Joselow, *Where Charlie Kirk Stood on Key Political Issues*, New York Times, last updated Sep. 21, 2025, https://www.nytimes.com/2025/09/11/us/charlie-kirk-views-guns-gender-climate.html.

comment on Roger's Facebook page.

**Anonymous Complaint about Ms. Dockery's Social Media Comments to DCS.**

42. On September 12, 2025, the Department allegedly received a citizen complaint about Ms. Dockery's comment. Upon information and belief, this complaint was made by Derek Webb, a person Ms. Dockery knows outside of work.

43. There is no indication that the alleged complaint was made by anyone who had ever had any dealings with the Department.

**Commissioner Quin Terminates Ms. Dockery Based Soley on Her Facebook Posts and Comments.**

44. This complaint prompted the Department to initiate an investigation into "whether [Ms. Dockery's] comments and/or other social media posts may have contributed to a hostile work environment."

45. It has become clear that the investigation was going to conclude with Ms. Dockery's termination regardless of what the investigation uncovered.

46. As part of the investigation, Ms. Dockery explained that "chickens coming home to roost" refers to a statement made by Malcolm X after the assassination of John F. Kennedy, in which he interpreted the event as a consequence of American foreign policy and its past actions in Vietnam.

47. Ms. Dockery explained that her comment referred to the irony of Kirk's statement about the necessity of some gun deaths being "worth it" to protect the Second Amendment and then becoming the victim of gun violence himself.

48. Ms. Dockery explained that her comment was not a call to violence or meant as a

threat.

49. The complaint also apparently prompted the Department to review Ms. Dockery's personal Facebook posts dating "several years back."

50. The Department says that this review lead to the identification of "potentially derogatory posts." The posts the Department references that it found are those referenced herein above regarding the RTTL group.

51. The Department then concluded that Ms. Dockery's comments "reflect negatively on the State of Tennessee and the Department of Children's Services.

52. Going further, the Department stated

> If a DCS client or member of the public were to view your comments or posts, it could lead to the impression that you provide substandard treatment to white clients or clients who do not identify with your political and social beliefs. Further, your comments could be interpreted as hostility towards those who do not align with your beliefs.

53. This conclusion was reached despite Ms. Dockery's twenty-two (22) year tenure with the Department without a single complaint of differential treatment of a client or co-worker.

54. Ms. Dockery was terminated as a result of her Facebook posts and comment on November 18, 2025.

55. The termination letter sent to Ms. Dockery was signed by Quin.

56. In the termination letter, Quin acknowledged that Ms. Dockery's Facebook comment about Kirk and her posts about the RTTL group were the sole reason she was being terminated, because, in her view, Ms. Dockery's comments were "potentially derogatory," and "reflect negatively on the State of Tennessee."

57. Quin's letter asserted without explanation that Ms. Dockery had violated the state's Code of Conduct for employees and the Department's human resources policies, including its Policy on Personal Use of Social Media ("Social Media Policy"), for her one Facebook comment

to a friend's post about Charlie Kirk and sharing of two reels expressing her satirical view of a so-called (and likely illegal) "whites-only" housing development group.

58. In the Facebook comment and posts in question, Ms. Dockery did not purport to speak for the Department. She did not mention the Department in any way.

59. Neither Quin nor anyone in the Department has shown or ever suggested that Ms. Dockery's personal comment to her friend on Facebook could in any way be interpreted as a communication of or on behalf of the Department.

60. Other than vaguely describing the comment and posts in question, Quin's letter did not explain how Ms. Dockery had allegedly violated the Department's Social Media Policy for having made a private comment on social media on her own time, off-the-clock, and having nothing whatsoever to do with her employment with the Department.

**Ms. Dockery's Comment Did Not Impair the Department or Its Work.**

61. As reflected in her termination letter, Quin decided to terminate Ms. Dockery solely because of her Facebook comment and posts, with which she disagreed.

62. None of the Department's officials, nor anyone else in the Department identified or alleged any disruption of the Department's work or operations related in any way to Ms. Dockery's personal Facebook comment.

63. None of Ms. Dockery's coworkers complained about her Facebook comment or asserted that there had been any disruption of the Department's work or operations in any way.

64. Indeed, there was no disruption of the Department's work as a result of Ms. Dockery's personal Facebook comment and posts.

65. There was no interruption or interference with the Department's provision of services to Tennesseans as a result of Ms. Dockery's personal Facebook comment and posts.


Case 2:26-cv-00023-DCLC-CRW Document 1 Filed 01/30/26 Page 9 of 16 PageID #: 9

66. Ms. Dockery's expression of an opinion through her Facebook account did not impair the Department's mission or work in any way, and there is no indication that any client or constituent of the Department ever saw or cared about her personal Facebook comment.

67. No reasonable official in Quin's position could have concluded that Ms. Dockery's personal comment to a friend and sharing of satirical reels on Facebook would impair discipline, harmony, public trust, or workplace functioning.

**Ms. Dockery Appeals Her Termination.**

68. Ms. Dockery appealed her termination pursuant to Tenn. Code Ann. § 8-30-318, submitting a Step I Appeal to the Department on November 26, 2025.

69. In her Step I Appeal, Ms. Dockery detailed that her Facebook profile has never stated that she is an employee of the Department, that she has never shared Department content (including public recruitment posts), and that her posts have never been made under an alias or with intent to mislead.

70. The Step I Appeal also stated that her comment about Kirk was merely to point out the irony of Kirk's death being by gun violence, and reiterated that it was not a call to violence, nor was it celebratory or threatening, but merely commentary on widely reported public statements.

71. Ms. Dockery's Step I Appeal reiterates that she never expressed harmful intent toward any person or population.

72. The Step I Appeal affirms that the other two posts that the Department found "potentially offensive" were not created by Ms. Dockery, that both originated from white individuals and were shared without malicious intent, and that no coworker nor client has ever reported concern or discomfort regarding Ms. Dockery's social media activity.

73. Ms. Dockery argued, correctly, that there is no evidence that her posts have ever impacted the way she performs her duties.

74. In the Step I Appeal, Ms. Dockery disputes the Department's conclusory allegations that her comments on Facebook could contribute to a hostile work environment by noting that in her twenty-two (22) years and nine (9) months with the Department, she had never received a complaint from a co-worker regarding her social media posts, and that her record reflects professionalism, collaboration, and positive working relationships across the department.

75. Ms. Dockery also notes that during her extensive tenure she has served families of all backgrounds with zero complaints regarding discrimination, bias, or unequal treatment. Ms. Dockery notes that every family with whom she works is provided intake information that includes instructions on how to file a complaint if they feel they have been discriminated against, and that no family has ever done so as it relates to Ms. Dockery.

76. Ms. Dockery notes that the person who made the complaint about her comment regarding Kirk is someone with whom the Department has not worked and with whom she has had no direct interactions as part of her work with the Department. Ms. Dockery points out that the Department has put forth no evidence that this individual, nor anyone he knows, has ever been a client of DCS or interacted with Ms. Dockery in a professional capacity.

77. Ms. Dockery concludes her appeal by asking that her termination be reconsidered.

78. In denying the appeal, the Department acknowledged that during Ms. Dockery's tenure she had completed satisfactory case work, had positive performance evaluations, and no discipline.

79. Yet, despite this, the termination decision was upheld. The decision to deny the Step I Appeal was also signed by Quin.

80. Ms. Dockery filed a Step II Appeal to the Tennessee Department of Human

Resources.

81. This appeal was also denied, this time by Tennessee Department of Human Resources Commissioner Juan Williams.

82. In the denial, Williams made it clear that the termination was solely because of Ms. Dockery's comment about Kirk, stating:

> In this review, DOHR must apply a preponderance of the evidence standard, meaning whether, more likely than not, Ms. Dockery's conduct rose to a level which may impact her ability to effectively perform her duties. IA noted the nature of Ms. Dockery's comments, *including reference that Mr. Kirk's death was somehow justified because of past comments, did not meet the professional standards which she is required to uphold*.

83. Williams also acknowledges that the Department had not received any further complaints regarding Ms. Dockery's comments.

84. He also states that "the perception that clients not sharing [Ms. Dockery's] strong opinions on political and social matters could receive negative treatment, presents risk to DCS and the integrity of its programs."

85. Ms. Dockery has now submitted her Step III Appeal.[8]

86. Ms. Dockery has consistently expressed her desire to return to her job and remains willing and able to perform all essential duties of her position. No facts exist indicating that reinstatement would be infeasible or inappropriate.

---

[8] The fact that this appeal has not yet concluded is no bar to this suit. *See Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 516 (1982) (holding that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983"); *Pakdel v. City and County of San Francisco, California*, 594 U.S. 474, 475 (2021) (holding that requirement to comply with "agency's administrative procedures for seeking relief' was "at odds with `the settled rule ... that exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983"') (quoting *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 185 (2019)).

## CAUSES OF ACTION

**First Amendment Retaliation Under 42 U.S.C. § 1983**

**(Against Margie Quin in Her Individual and Official Capacities)**

87. Ms. Dockery incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

88. "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987) (citing *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972)).

89. As described herein, Quin made the decision to fire Ms. Dockery solely because of her comments through her personal Facebook account expressing her personal view about the friend's post concerning Charlie Kirk and RTTL, despite knowing the First Amendment protected Ms. Dockery's speech, and with no justifiable interest in the Department precluding or punishing Ms. Dockery's personal speech on a public issue.

90. In doing so, Quin unconstitutionally took an adverse employment action against Ms. Dockery in retaliation for her protected speech. *See Noble v. Cincinnati & Hamilton County, Pub. Libr.,* 112 F.4th 373, 385 (public employee's "hyperbolic speech" on Facebook "was not enough to fire him").

91. By firing Ms. Dockery for speaking as a private citizen on a matter of public concern, Quin violated Ms. Dockery's clearly established First Amendment rights that any reasonable government official would recognize as protected and unlawful to infringe upon.

92. Quin terminated Ms. Dockery with callous disregard for her First Amendment rights. Quin acted recklessly and without cause by terminating Dockery based solely on social media comments and failing to conduct any investigation into whether her speech disrupted the work environment. *See id.* at 384 (noting a public employer's forecast of disruption "must be

objectively reasonable" and cannot be based solely on an employee expressing a view contrary to the powers-that-be at that institution).[9]

93. As a direct and proximate result of Quin's actions as described above, Ms. Dockery was deprived of her constitutional right to free expression and experienced emotional distress and financial losses.

94. Ms. Dockery lost her job, her paycheck, and her employee benefits to which she was entitled. Ms. Dockery has also experienced anxiety, depression, and humiliation because of her termination and treatment by Quin and the Department.

95. Ms. Dockery has also lost retirement benefits and other benefits she earned in her position with the Department.

96. As a legal consequence of Quin's violation of Ms. Dockery's First Amendment rights, Ms. Dockery is entitled to compensatory and punitive damages from Quin in her individual capacity, as well as the reasonable costs of this action, including attorneys' fees.

97. Ms. Dockery is also entitled to injunctive relief reinstating her to her position and a declaration that her termination was unlawful retaliation for her protected expression.

## **DAMAGES**

98. As a direct and proximate result of Defendant's unlawful and willfully discriminatory and retaliatory behavior, Ms. Dockery has suffered and will continue to suffer

---

[9] In an interview following Kirk's death and preceding Ms. Dockery's termination, when asked about public employees who had been terminated for their comments about Kirk's death, Governor Bill Lee, who appointed Quin to office, showed his support for the terminations, stating that "as far as comments from people who might celebrate the death of a father and a husband, it's entirely inappropriate and the actions taken across this state by multiple universities and otherwise, those actions are entirely appropriate." Natalea Hillen, *Governor Bill Lee calls comments celebrating Charlie Kirk's death 'entirely inappropriate'*, WCYB News 5, September 18, 2025, https://wcyb.com/news/local/governor-bill-lee-calls-comments-celebrating-charlie-kirks-death-entirely-inappropriate.

humiliation and embarrassment, emotional distress, lost wages and benefits (including retirement account contributions and value), loss of earning capacity, loss of future income, and other benefits and privileges of employment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shedenna Dockery respectfully prays for the following relief:

99. A declaratory judgment that Quin unconstitutionally retaliated against Ms. Dockery because of speech protected under the First and Fourteenth Amendments to the Constitution of the United States;

100. An award of monetary damages in the amount of front pay, back pay, other compensatory damages, and pre- and post-judgment interest;

101. Additionally, or in the alternative, an affirmative order requiring Defendant to reinstate Plaintiff to her previous employment position with all back wages, benefits, and other appropriate remedies;

102. An award of punitive damages against Quin for her reckless and willful disregard for Ms. Dockery's First Amendment rights;

103. An award of reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

104. A jury be empaneled to serve as the trier of fact; and

105. An award of all such other and further legal and equitable relief to which Ms. Dockery may be entitled under the facts of this case.

**<u>DEMAND FOR JURY TRIAL</u>**

In compliance with Fed. R. Civ. P. 38, Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

*s/ Clint J. Coleman*
CLINT J. COLEMAN (BPR # 038413)
EAST TENNESSEE EMPLOYMENT LAW, PLLC
520 W. Summit Hill Dr.
Ste. 101
Knoxville, TN 37902
(865) 383-1053
clint@ETNemploymentlaw.com

*Attorney for Shedenna Dockery*